901 A.2d 303

CHRISTINE THOMSEN, PLAINTIFF, v. JANICE D. MERCER–CHARLES, CARING, INC., CARING HOUSE PROJECTS, INC., CARING PROJECTS INC., CARING MEDICAL DAY SERVICES, INC., CARING FELLOWSHIP CENTER, INC., COASTAL SUPPORT SERVICES, INC., JOHN DOES # 1–5 AND JOHN DOES # 6–10, DEFENDANTS.

ALICE BROWN, AS ADMINISTRATOR AD PROSEQUENDUM FOR THE HEIRS–AT–LAW OF ALICE F. WATTS, DECEASED, AND AS ADMINISTRATOR OF THE ESTATE OF ALICE F. WATTS, DECEASED, PLAINTIFFS, v. JANICE D. MERCER–CHARLES, CARING, INC., CARING HOUSE PROJECTS, INC., CARING MEDICAL DAY SERVICES, INC., CARING FELLOWSHIP CENTER, INC., COASTAL SUPPORT SERVICES, INC., CHRISTINE D. THOMSEN, IRENE MCMICHAEL, R.C. MAXWELL CO., ATLANTIC CITY ELECTRIC CO., BELL ATLANTIC–NEW JERSEY, INC., DEFENDANTS, AND BELL ATLANTIC–NJ, INC., THIRD PARTY PLAINTIFF, v. COUNTY OF ATLANTIC, THIRD PARTY DEFENDANT, AND IRENE MCMICHAEL, THIRD PARTY PLAINTIFF, v. PHILADELPHIA INDEMNITIES INSURANCE COMPANY, RELIANCE INSURANCE COMPANY AND NEW JERSEY PROPERTY–LIABILITY INSURANCE GUARANTY ASSOCIATION, THIRD PARTY DEFENDANTS.

LARRY SPELL, BY HIS GUARDIAN AD LITEM, PATRICIA LYNCH, PLAINTIFF–APPELLANT, v. JANICE D. MERCER, CARING INC., CARING HOUSE PROJECTS, INC., CARING MEDICAL DAY SERVICES, CARING FELLOWSHIP CENTER, INC., COASTAL SUPPORT SERVICES, INC., CHRISTINE D. THOMSEN, IRENE MCMICHAEL, JOHN DOE, MARY ROSE, ABC PARTNERSHIPS AND XYZ CORPORATIONS, DEFENDANTS,

AND IRENE MCMICHAEL, THIRD PARTY PLAINTIFF, v. PHILADELPHIA INDEMNITIES INSURANCE COMPANY AND RELIANCE INSURANCE COMPANY, THIRD PARTY DEFENDANTS, AND NEW JERSEY PROPERTY–LIABILITY INSURANCE GUARANTY ASSOCIATION, THIRD PARTY DEFENDANT–RESPONDENT.

JANICE D. MERCER–CHARLES AND DEXTER CHARLES, HER HUSBAND, PLAINTIFFS, v. CHRISTINE D. THOMSEN, DEFENDANT, v. BELL ATLANTIC–NJ, THIRD PARTY PLAINTIFF, v. COUNTY OF ATLANTIC, THIRD PARTY DEFENDANT, AND IRENE MCMICHAEL, THIRD PARTY PLAINTIFF, v. PHILADELPHIA INDEMNITIES INSURANCE COMPANY, RELIANCE INSURANCE COMPANY, AND NEW JERSEY PROPERTY–LIABILITY INSURANCE GUARANTY ASSOCIATION, THIRD PARTY DEFENDANTS.

LARRY SPELL, BY HIS GUARDIAN AD LITEM, PATRICIA LYNCH, PLAINTIFF, v. R.C. MAXWELL CO., ATLANTIC CITY ELECTRIC COMPANY, BELL ATLANTIC–NJ, WEST JERSEY HEALTH SYSTEMS, WEST JERSEY PARAMEDICS UNIT, GALLOWAY TOWNSHIP VOLUNTEER AMBULANCE SQUAD, WEST DIVISION, EGG HARBOR CITY RESCUE SQUAD, WILLIAM B. KESSLER MEMORIAL HOSPITAL, EUGENE M. MLYNARCZYK, M.D., LISA RASOM, RN, L. DEFRANCISCO, RN, JOHN DOE AMBULANCE SERVICE AND PARAMEDICS UNITS 1–10, AND JOHN DOE PHYSICIANS AND NURSES 1–10, DEFENDANTS, v. BELL ATLANTIC–NJ, THIRD PARTY PLAINTIFF, v. COUNTY OF ATLANTIC, THIRD PARTY DEFENDANT, AND IRENE MCMICHAEL, THIRD PARTY PLAINTIFF, v. PHILADELPHIA INDEMNITIES INSURANCE COMPANY, RELIANCE INSURANCE COMPANY AND NEW JERSEY PROPERTY–LIABILITY INSURANCE GUARANTY ASSOCIATION, THIRD PARTY DEFENDANTS.

Argued January 30, 2006—Decided June 19, 2006.

*Mark S. Levy* argued the cause for appellant (*Levy, Angstreich, Finney, Baldante, Rubenstein & Coren,* attorneys; *Mr. Levy and Paul N. Bonavita,* on the brief).

*Mark M. Tallmadge* argued the cause for respondent (*Bressler, Amery & Ross,* attorneys).

LaVECCHIA, J., delivered the opinion of the Court.

The New Jersey Property–Liability Insurance Guaranty Act, *N.J.S.A.* 17:30A–1 to –20 ("the Act"), provides a mechanism for the payment of claims on behalf of member insurers that become insolvent. *See N.J.S.A.* 17:30A–2. This appeal involves interpretation of the Act's "setoff" provision, *N.J.S.A.* 17:30A–12b. We must determine whether the Act requires payment to a catastrophically injured victim when another solvent insurer has paid the victim an amount that exceeded the Act's maximum per claim payable amount but did not cover fully the victim's damages. In other words, may the payment required by the Act be set off by

the claim payment made by a solvent insurer to a partially compensated victim? The trial court did not permit the setoff and required the maximum per claim payment permitted by the Act. The Appellate Division, however, reversed. Because there was a dissent in the Appellate Division, this matter is before us as an appeal as of right. *R.* 2:2–1. We now reverse and reinstate the judgment of the trial court.

## I.

On September 5, 1996, plaintiff Larry Spell suffered catastrophic injuries as a result of a motor vehicle accident. At the time, he was being transported in a van owned by Caring, Inc. ("Caring") and driven by Janice Mercer–Charles. Caring leased the van to Caring Medical Day Services, Inc. ("CMDS") and Mercer–Charles operated it as an employee of both CMDS and Caring. At an intersection in Atlantic County, the van collided with a vehicle operated by Christine Thomsen. Mercer–Charles lost control of the van and struck a utility pole owned by Bell Atlantic–New Jersey. Spell's neck was fractured, rendering him a quadriplegic. Another passenger in the van, Alice Watts, died as a result of the accident.

In December 1996, Thomsen filed suit first seeking damages for injuries sustained in the accident. Spell, Mercer–Charles, and the Estate of Alice Watts, also filed complaints seeking damages. Specifically, Spell, by and through a guardian ad litem, filed claims against Mercer–Charles, Caring, CMDS, Bell Atlantic–New Jersey, and Thomsen, as well as others. The matters were subsequently consolidated.

At the time of the accident, Mercer–Charles had an aggregate of two million dollars of liability coverage through two insurance policies. One policy, issued by Reliance Insurance Company ("Reliance") in the amount of one million dollars, insured Caring as the owner of the van. A second policy, issued by Philadelphia Insurance Company ("PIC"), provided one million dollars in liability coverage and insured CMDS as the lessee of the van.

On February 23, 2000, Spell offered to settle his claims against Mercer–Charles for the aggregate two million dollar policy limits. PIC and Reliance ultimately accepted Spell's offer on June 1, 2001 and the parties entered into a consent order permitting PIC and Reliance to deposit their respective policy limits into court, pending an allocation hearing. PIC deposited its payment. However, after Reliance agreed to the settlement but before it made the deposit into court, the insurer was declared insolvent by Pennsylvania insurance regulators and was placed in liquidation pursuant to court order.

As a result of Reliance's insolvency, on January 6, 2003, the New Jersey Property–Liability Insurance Guaranty Association ("Association") [1] intervened in the litigation as a third-party defendant and thereby assumed responsibility for claims against Reliance's insured. The Association subsequently filed a motion seeking a declaration that its $300,000 per claim maximum statutory obligation could be reduced by any amount received by Spell from PIC. For purposes of the motion, the parties agreed that Spell's damages exceeded two million dollars.

The trial court denied the Association's motion. The court concluded that when a person is injured in an accident for which there is liability coverage under two primary insurance policies, one of which becomes uncollectible due to the insolvency of the issuing company, any payment made by a solvent carrier would be applied to an injured claimant's total amount of damages, but would not be used as a setoff under *N.J.S.A.* 17:30A–12b to reduce the amount that must be paid by the Association. In explaining its decision, the court stated that, with one exception, every other court that had considered the question had come to the same conclusion. Further, the court noted that its interpretation of the setoff provision would not result in a "windfall" for Spell. Accord-

---

[1] To implement the Act, the Legislature created "a private, nonprofit, unincorporated, legal entity ... known as the New Jersey Property–Liability Insurance Guaranty Association." *N.J.S.A.* 17:30A–6.

ingly, the trial court entered an Order of Final Judgment in favor of Spell against Mercer–Charles in the amount of $1.3 million. The Order preserved for appeal the Association's claim that, as against its maximum statutory obligation of $300,000, it was entitled to a credit equaling the amount paid by PIC.

On the Association's appeal, the Appellate Division reversed and remanded for entry of judgment declaring that the Association's obligation to pay Spell's covered claim had been eliminated by PIC's payment. *Thomsen v. Mercer–Charles,* 377 *N.J.Super.* 267, 872 *A.*2d 800 (App.Div.2005). The majority noted that the Association is a "limited safety net .... [and] not designed to put a claimant in the same position as if there had been no insolvency." *Id.* at 274, 872 *A.*2d 800. The Association therefore is only required to pay for losses that qualify as "covered claims," and those are subject to a $300,000 statutory cap regardless of whether a claimant's policy exceeds that amount. *Ibid.* When an injured party's claim is covered by multiple policies, issued by solvent as well as subsequently insolvent insurers, the majority concluded that a "claimant must first exhaust the solvent insurer's policy limits." *Id.* at 274–75, 872 *A.*2d 800. For purposes of a claimant's coverage under the Act then, a "covered claim" is "reduced by the amount recovered from a solvent insurer." *Id.* at 275, 872 *A.*2d 800. In so holding, the court relied on the statutory language and legislative intent to conclude that the Act was designed to "insure[ ] that ... a claimant receives damages from some source, including the Association, up to a cap or ceiling of $300,000." *Ibid.* However, "[i]f the claimant receives from a solvent insurer an amount equal to or greater than $300,000, the Association's obligation to provide statutory benefits is exhausted. Thus, the Association's funds are preserved in order to provide a measure of relief to other potential claimants." *Ibid.*

In the course of its decision, the majority rejected Spell's argument that the Act's setoff provision was meant only to apply to insurance proceeds payable as a direct result of the insolvency of the insurer. *Ibid.* The court noted that it could not identify

any type of coverage, other than uninsured motorist coverage, that is payable directly as a result of the insolvency of an insurer. *Ibid.* The majority also rejected the argument that any setoff should be deducted from the total amount of Spell's damages, not from the $300,000 statutory maximum for a claim under the Act. *Id.* at 276, 872 *A.*2d 800. The court determined that the Act was unambiguous in respect of its mandate that any setoff be deducted from a "covered claim," which, by definition, is "the amount that the Association is potentially obligated to pay, not the full extent of the damages suffered by the claimant." *Ibid.*

The dissent filed by Judge Weissbard stated that he would affirm the trial court's decision for the reasons expressed by the trial court. *Id.* at 278, 872 *A.*2d 800 (Weissbard, J., dissenting). Pursuant to *Rule* 2:2–1, plaintiff filed a Notice of Appeal as of right to this Court.

## II.

### A.

The Legislature enacted the Act [2] to "provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment, [and] to minimize financial loss to claimants or policyholders because of the insolvency of an insurer...." *N.J.S.A.* 17:30A–2a. The Act applies to "all kinds of direct insurance, except life insurance, accident and health insurance, workers' compensation insurance, title insurance, annuities, surety bonds, credit insurance, mortgage guaranty insurance, municipal bond coverage, fidelity insurance, investment return assurance, ocean marine insurance and pet health insurance."

---

[2] On December 22, 2004, the Legislature made substantial revisions to the Act. Those revisions only apply prospectively, however. The amendatory legislation states that "[t]his act shall take effect immediately and shall apply to covered claims resulting from insolvencies occurring on or after that date." *L.* 2004, *c.* 175, § 8. Accordingly, we apply herein the version of the Act that pre-dates those amendments.

*N.J.S.A.* 17:30A–2b. The Legislature also created "a private, nonprofit, unincorporated" Association to implement the Act, *N.J.S.A.* 17:30A–6, and further required that "[a]ll insurers defined as member insurers ... shall be and remain members of the association as a condition of their authority to transact insurance in this State." *Ibid.*

The Association is "obligated to the extent of the covered claims against an insolvent insurer...." *N.J.S.A.* 17:30A–8a(1). Such obligation, however, "include[s] only that amount of each covered claim which is less than $300,000...." *Ibid.* The Act defines "covered claim" to mean "an unpaid claim, including one of unearned premiums, which arises out of and is within the coverage, and not in excess of the applicable limits of an insurance policy to which this act applies, issued by an insurer, if such insurer becomes an insolvent insurer...." *N.J.S.A.* 17:30A–5d.

The Act imposes further limits on the benefits that the Association must pay by establishing a priority of claims. *See N.J.S.A.* 17:30A–12 (Priority of Claims). *N.J.S.A.* 17:30A–12a provides a priority among claims when "a covered claim ... may be recovered from more than one insurance guaranty association...." *N.J.S.A.* 17:30A–12a. Importantly for purposes of this appeal, *N.J.S.A.* 17:30A–12b, establishes a priority applicable when multiple insurance policies cover the claim.

*N.J.S.A.* 17:30A–12b provides:

Any person having a claim against an insurer, whether or not the insurer is a member insurer, under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his right under that other policy. An amount payable on a covered claim under [this Act] shall be reduced by the amount of recovery under any such insurance policy.

[*N.J.S.A.* 17:30A–12b.] [3]

---

[3] As noted, *N.J.S.A.* 17:30A–12b was amended and now reads as follows:

Any person having a claim against an insurer, whether or not the insurer is a member insurer, under any provision in, *except for a claim for coverage for personal injury protection benefits issued pursuant to [C.39:6A4 and C.39:6A–3.1], under* an insurance policy other than a policy of an insolvent insurer

## B.

The "paramount [judicial] goal when interpreting a statute" is to determine and fulfill the legislative intent. *DiProspero v. Penn*, 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). To achieve that goal, we first look to the statutory language, *State v. Pena*, 178 *N.J.* 297, 307, 839 *A.*2d 870 (2004), and interpret the language in accordance with its plain meaning if it is " 'clear and unambiguous on its face and admits of only one interpretation.' " *State v. Thomas*, 166 *N.J.* 560, 567, 767 *A.*2d 459 (2001) (quoting *State v. Butler*, 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982)). If the statute's language " 'is susceptible to different interpretations, the court considers extrinsic factors, such as the statute's purpose, legislative history, and statutory context to ascertain the legislature's intent.' " *Aponte–Correa v. Allstate Ins. Co.*, 162 *N.J.* 318, 323, 744 *A.*2d 175 (2000) (quoting *Twp. of Pennsauken v. Schad*, 160 *N.J.* 156, 170, 733 *A.*2d 1159 (1999)); *see also DiProspero, supra*, 183 *N.J.* at 492–93, 874 *A.*2d 1039; *State v. Pena, supra*, 178 *N.J.* at 307–08, 839 *A.*2d 870.

Plaintiff Spell contends that the language of *N.J.S.A.* 17:30A–12b is ambiguous and therefore requires resort to extrinsic evidence to discern the legislative intent. He asserts that it is appropriate to consider the Legislature's recent amendment removing the setoff provision from Section 12b in ascertaining the

---

which is also a covered claim, shall be required to exhaust first his right under that other policy. An amount payable on a covered claim under [C.17:30A–1, et seq] shall be reduced by the amount of recovery under any such insurance policy.

[*N.J.S.A.* 17:30A–12b.]

A version of the deleted last sentence of the pre-amendment section 12b was added to the definition of the term "exhaust" in section 17:30A–5:

"Exhaust" means with respect to other insurance, the application of a credit for the maximum limit under the policy.... *The amount of a covered claim payable by the association shall be reduced by the amount of any applicable credits. . . .*

[*N.J.S.A.* 17:30A–5.]

Because those amendments only apply prospectively, *L.* 2004, *c.* 175, § 8, they do not affect this appeal.

intent of the original language. Spell argues that that indicates legislative recognition that the provision was ambiguous and unnecessary. Plaintiff also asserts that his interpretation of Section 12b is consistent with the Act's fundamental purpose to minimize financial loss to claimants caused by the insolvency of an insurer. Spell argues that his interpretation strikes a balance between properly compensating plaintiffs whose damages may be not completely satisfied, while protecting the financial viability of the Association.

The Association sees no ambiguity in Section 12b. It argues that the plain language of the provision requires that the payment made to plaintiff by PIC be set off from the Association's maximum statutory obligation. The statute states that the setoff shall be from an "[a]n amount payable on a covered claim," and, under the Act, the maximum amount payable on a covered claim is $300,000. Therefore, the setoff must be taken from the statutory maximum.

Despite the Association's protestations to the contrary, the language at issue is susceptible to more than one interpretation. Although Section 12b contemplates application of a setoff as between payments made by another solvent insurer and those due from the Association, and requires the solvent insurer's payment to be made first, it does not resolve the question in this case.[4] The issue is whether the setoff applies to the entire amount payable on the person's loss, thereby reducing or perhaps elimi-

---

[4] See Harrow Stores, Inc. v. The Hanover Ins. Co., 315 N.J.Super. 547, 554–56, 719 A.2d 196 (App.Div.1998) (explaining that language and legislative history of Section 12b establish that purpose was to avoid the consequences of "other insurance" clauses, thus "the insolvent insurer's policy, irrespective of any 'other insurance' clause in the policy, cannot be resorted to by the claimant until the policy limits under the solvent insurer's policy are exhausted."). Because the solvent insurer's policy entirely covered the victim's claim in Harrow, supra, the Association had no responsibility. 315 N.J.Super. at 555, 719 A.2d 196. Thus, to the extent that the Appellate Division relied on Harrow in reaching its conclusion, that reliance was misplaced because Harrow did not address the novel question before us.

nating the person's claim of damages before he or she need turn to the Association for satisfaction of the remainder, or whether the solvent insurer's payment is applied directly to the statutory maximum that the Association may pay on a "covered claim." Under the latter interpretation, the amount of the claimant's damages claim is only relevant to the extent it is less than the $300,000 statutory cap. Thus, the latter interpretation substantially minimizes tort victims' ability to recover their damages.

In our view, the last sentence of Section 12b is ambiguous in respect of its opening language of "[a]n amount payable on a covered claim." That language does not reveal whether or not the Legislature intended to have a covered claim remain payable by the Association to a person whose loss has not been satisfied by payment from another solvent insurer, as occurred here. Here, there remains an unsatisfied claim, for which plaintiff seeks compensation from the Association. Because this dispute about the proper determination and fulfillment of the legislative intent underlying Section 12b cannot be resolved by an examination of the statutory language alone, we turn to extrinsic sources for assistance.

### III.

New Jersey's Property–Liability Insurance Guaranty Association Act was passed in 1974, *see N.J.S.A.* 17:30A–1, and was modeled on the Post–Assessment Property and Liability Insurance Guaranty Association Model Act (Model Act) drafted by the National Association of Insurance Commissioners (NAIC). *Carpenter Tech. Corp. v. Admiral Ins. Co.,* 172 *N.J.* 504, 515, 800 *A.*2d 54 (2002). Originally, Section 12 was entitled "Priority of claim of associations in other states" and contained only one paragraph addressing the order of payment as among guaranty associations. *L.* 1974, *c.* 17, § 12. Our Legislature did not adopt the Model Act's second paragraph until 1996, when it added *N.J.S.A.* 17:30A–12b, the provision at issue in this case, *see L.* 1996, *c.* 156 § 2, and again tracked the language of the Model Act. New Jersey's

legislative title continued to describe the section as addressing "priority of claims." Notably, according to the legislative history of the Model Act, Section 12 was entitled "Nonduplication of Recovery" from the time the Model Act was adopted in 1962. More than thirty years later the title was changed to "Exhaustion of Other Coverage" in order "to better reflect the intent of the section." *See* Post–Assessment Property and Liability Insurance Guaranty Association Model Act, NAIC Model Laws, Regulations and Guidelines, at 540–1 (2006).

The Connecticut Supreme Court in construing the identical provision of its insurance guaranty association act found that the purpose

of providing … for a reduction of a covered claim "by the amount of any recovery" from other available insurance was to prevent a person from twice receiving benefits for the same loss or otherwise obtaining a windfall, not to reduce the amount of a claim for a loss that remains partially unsatisfied. The corresponding provision of the model act, which uses virtually the same language, is entitled "Non-duplication of Recovery." The different caption used by our legislature for [the provision] does not indicate a different purpose from that contemplated by the framers of the model act, but is simply more descriptive of the mechanism used to prevent a double recovery.

[*Connecticut Ins. Guaranty Ass'n v. Union Carbide Corp.*, 217 *Conn.* 371, 585 *A.*2d 1216, 1224–25 (1991) ].

*See also Aztec Well Servicing Co. v. Prop. & Cas. Ins. Guar. Ass'n*, 115 *N.M.* 475, 853 *P.*2d 726, 731 (1993) (adopting similar interpretation because, among other reasons, setoff provision "was designed to prevent double recovery or windfall, not to reduce the amount of the claimant's damages that remain partially unsatisfied."); *Rhode Island Insurers' Insolvency Fund v. Benoit*, 723 *A.*2d 303, 307 (R.I.1999) (concluding legislative purpose of setoff provision is prevention of double recovery, meaning "[a] claimant should not receive greater recovery than if the insolvent insurer had remained solvent," and adopting similar interpretation); *Int'l Collection Serv. v. Vermont Prop. & Cas. Ins. Guar. Ass'n*, 150 *Vt.* 630, 555 *A.*2d 978, 980 (1988) (adopting same approach in order to "achieve[ ] the intent of the section to prevent a duplication of recoveries, and comport[ ] with the act's purpose to leave a claimant in the same position as if there had been no insolvency.").

As the above decisions reflect, other courts have rejected the interpretation advanced before us by the Association. Those courts have concluded that to adopt the Association's interpretation would lead to "absurd" results, explained by following example:

> [U]nder [the Association's] view, a company could purchase two successive policies, each from a different insurer, and each providing $500,000 in coverage. The insured is sued for several million dollars in a case alleging continuous and progressive property damage. One of the insurers has become insolvent, so the insured files a claim with [the Association]. The insured also files a claim with the solvent insurer. The case settles for $1 million (a reasonable sum), and the solvent insurer pays its policy limits of $500,000. [The Association] could then refuse to pay anything on the ground that the insured had already recovered $500,000. In addition, the insured would sustain a loss on the premiums paid to the insolvent insurer.
>
> In contrast, if the insured had purchased only the policy from the insolvent insurer, it would still receive $500,000 (paid by [the Association]), and it would receive all of the insurance benefits for which it had paid. Thus, under [the Association's] interpretation, the insured would be put in a worse position for having bought two policies. We decline to apply the [Association's] statutes in this manner.
>
> [*CD Inv. Co. v. California Ins. Guar. Ass'n,* 84 *Cal.App.*4th 1410, 101 *Cal.Rptr.*2d 806, 816 (2000), review denied 2001 Cal. Lexis 987 (Cal. Feb. 14, 2001).]

Given that the New Jersey Legislature adopted the Model Act's language, we have no reason to believe that the Legislature intended a different interpretation of the provision than that commonly understood as having been intended by the drafters of the Model Act. Moreover, when New Jersey adopted the language of Section 12b, the Legislature had the benefit of the Connecticut Supreme Court's explanation and application of Section 12b. The very purpose of adoption of a model act is to encourage consistency in approach in the legislative language and its application. *See Carpenter, supra,* 172 *N.J.* at 515, 800 *A.*2d 54 ("In passing New Jersey's Act, the Legislature sought to bring our State within a nationwide network of individual insurance guaranty association statutes designed to spread equitably the risk of insurer insolvency among the states."). The salutory purpose of uniformity is advanced by interpreting Section 12b consistent with the nearly unanimous approach taken by our sister jurisdictions, all but one of which have interpreted the section as did the

trial court below. *See Marra v. Wilson,* 2003 WL 367831, 2003 *Del.Super.* LEXIS 63 (Feb. 20, 2003) (holding that insurance credit should be applied to Association's statutory liability rather than to plaintiffs' total amount of damages). We therefore hold that when an insured is covered by both a solvent and an insolvent insurer and the solvent insurer has paid the insured an amount exceeding the Act's maximum payment, but which falls short of the insured's total damages, the insured may seek compensation from the Association.

The interpretation we adopt today, moreover, is consistent with the understanding that the Act is remedial legislation deserving of liberal construction. *Carpenter, supra,* 172 *N.J.* at 514, 800 *A.*2d 54. Although we do not dismiss concerns about preserving the Association's funds, those considerations do not override the purpose of providing relief to a plaintiff who will not be wholly compensated due to the insolvency of an insurer and who will not be receiving a duplication of benefits as a result of our interpretation of a covered claim.

## IV.

The judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for reinstatement of the judgment in favor of plaintiff.

*For reversal/remandment/reinstatement*—Chief Justice PORITZ and Justices LaVECCHIA, ZAZZALI, ALBIN and WALLACE—5.

*Opposed*—None.