859 A.2d 452 (2004)
372 N.J. Super. 392
Leon PRIMUS and Isis Primus, Plaintiffs-Respondents,
v.
ALFRED SANZARI ENTERPRISES t/a Heights Plaza Associates, Heights Plaza Associates, Pinto Services, Thompson Mechanical, F.C. Electric, ISCO Services, Business Flooring, D.D.B. Interiors, Tri-County Printers, Vetter Glass, Sparkle Industries, Main Lock Shop, Scientific Building and *453 Kulkey Brothers Hardware, ACE Scaffolding, Inc., County Glass & Metal Installers, Supershute, Wraparound, Inc., aka, Wrap Around, Inc., and/or Supershute Company, Defendants, and
New Jersey PropertyLiability Insurance Guaranty Association, Intervenor-Appellant, and
Alfred Sanzari Enterprises t/a Heights Plaza Associates and Heights Plaza Associates, Third-Party Plaintiffs,
v.
ACE Scaffolding, Inc., Pinto Services, Thompson Mechanical, F.C. Electrical, ISCO Services, Interiors, Tri-County Printers, Vetter Glass, Sparkle Industries, Main Lock Shop, Scientific Building and Kulkey Brothers Hardware, Third-Party Defendants.
New Jersey PropertyLiability Insurance Guaranty Association, Intervenor-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued September 22, 2004.
Decided October 19, 2004.
*455 Richard J. Williams, Jr., Morristown, argued the cause for intervenor-appellant (McElroy, Deutsch & Mulvaney, attorneys; Mr. Williams, of counsel and on the brief).
Clifford A. Herrington, Jersey City, argued the cause for respondents, Leon Primus *456 and Isis Primus (Margulies, Wind & Herrington, attorneys; Mr. Herrington, on the brief).
Mark M. Tallmadge, New York City, argued the cause for intervenor-respondent, New Jersey PropertyLiability Insurance Guaranty Association (Bressler, Amery & Ross, attorneys; Mr. Tallmadge, on the brief).
Before Judges CONLEY, LISA and WINKELSTEIN.
The opinion of the court was delivered by
LISA, J.A.D.
This appeal requires determination of whether in a multi-defendant case all sums paid in settlement to a plaintiff by solvent insurers are available to satisfy in full a workers' compensation lien where one of the tortfeasors who contributed to the settlement was represented by the New Jersey Property-Liability Insurance Guaranty Association (Association) because its insurer was insolvent. The aggregate non-Association contributions to the settlement exceeded the amount of the lien. In a published opinion, the Law Division found that plaintiff was entitled to a pro rata credit equal to the percentage of the settlement represented by the Association's contribution, thus reducing the compensation carrier's reimbursement by that percentage of its lien. Primus v. Alfred Sanzari Enters., 363 N.J.Super. 538, 543, 833 A.2d 697, 700-01 (Law Div.2003). We reverse. We hold that the applicable provisions of the New Jersey Property-Liability Insurance Guaranty Association Act (Act), N.J.S.A. 17:30A-1 to -20, do not authorize such a credit, and the compensation carrier is entitled to full reimbursement of its lien from non-Association funds.
Plaintiff, Leon Primus, an employee of County Glass & Metal Installers, Inc., was injured while in the course of his employment. New Jersey Manufacturers Insurance Company (NJM) provided workers' compensation coverage for Primus' employer, and commenced payment of benefits for hospital and medical expenses and temporary and permanent disability. By the time of the third-party settlement, NJM had paid $186,638.94, and anticipated payment of an additional $79,872, for a total of $266,510.94.
Plaintiff's injury occurred on a building renovation construction site. A debris chute collapsed and fell on him. Joined by his wife suing per quod, plaintiff filed a third-party action against several potentially responsible parties, including the owner of the building and various other parties alleged to have manufactured, supplied, assembled, controlled, maintained or secured the debris chute and associated scaffolding.
The complaint, filed on plaintiff's behalf by Horn, Shechtman and Hirsch, P.C. (Horn Shechtman), utilized the fictitious name practice authorized by Rule 4:26-4 with respect to some defendants. The identity of one fictitiously-named defendant, ascertained as discovery progressed, was Ace Scaffolding, Inc. (Ace), which allegedly assembled the debris chute. Horn Shechtman moved to amend the complaint to specify Ace's true name. An issue arose as to whether Horn Shechtman could have, with the exercise of due diligence, ascertained Ace's identity before expiration of the statute of limitations. Therefore, Horn Shechtman was exposed to a possible risk based on professional negligence to the extent of any fault on Ace's part. See Farrell v. Votator Div. of Chemetron Corp., 62 N.J. 111, 120-23, 299 A.2d 394, 398-400 (1973); Stegmeier v. St. *457 Elizabeth Hosp., 239 N.J.Super. 475, 484-85, 571 A.2d 1006, 1011-12 (App.Div.1990).
Plaintiff obtained new counsel. Horn Shechtman informed its professional liability carrier, Reliance Insurance Company (Reliance), of the potential claim. Reliance became insolvent and went into receivership, and the Association assumed its contractual obligations as required by the Act. N.J.S.A. 17:30A-8. Although Horn Shechtman had not been named as a defendant in the action, the Association's attorney participated in a settlement conference with the parties to the action. This occurred prior to a due diligence hearing regarding Horn Shechtman's identification of Ace. NJM was not invited to participate.
An overall settlement was agreed upon by which plaintiff would be paid $800,000, including $50,000 from the Association on Horn Shechtman's behalf. The remaining $750,000 would be paid by solvent insurers on behalf of the various defendants, including $25,000 on behalf of Ace. NJM sought reimbursement from the settlement proceeds of the full amount of its workers' compensation lien, based on total benefits of $266,510.94. Plaintiff moved to limit reimbursement of the lien on a pro rata basis in proportion to the Association's contribution to the settlement, namely 1/16 ($50,000/$800,000) or $16,656.93.[1] NJM was granted leave to intervene and opposed the motion. The judge granted plaintiff's motion and ordered that "the plaintiff will be permitted an offset or credit of $16,656.93, which represents 1/16th of the workers' compensation lien."[2] NJM appealed. We granted leave to the Association to intervene in the appeal.
Resolution of the issue in this case requires analysis of several provisions of the Act to determine whether the Act requires reduction of NJM's lien. The compensation lien is statutorily created and generally attaches to "any sum" recovered by the injured worker from a third-party, without regard to such equitable considerations as whether the worker has *458 been fully compensated. N.J.S.A. 34:15-40; Frazier v. New Jersey Mfrs. Ins. Co., 142 N.J. 590, 597-98, 667 A.2d 670, 673-74 (1995); Utica Mutual Ins. Co. v. Maran & Maran, 142 N.J. 609, 613, 667 A.2d 680, 681-82 (1995); DeLane ex rel. DeLane v. City of Newark, 343 N.J.Super. 225, 234, 778 A.2d 511, 516-17 (App.Div.2001); Laureano v. New Jersey Transit Bus Operations, Inc., 220 N.J.Super. 295, 299, 531 A.2d 1361, 1363-64 (App.Div.1987), certif. denied, 110 N.J. 176, 540 A.2d 174 (1988). It is common that third-party settlements represent compromises, based on considerations of liability, coverage, expediency, certainty, and the like. Yet, N.J.S.A. 34:15-40 requires full reimbursement.
The underlying purpose of N.J.S.A. 34:15-40 is to prevent double recovery. "The `double recovery' that the Legislature intended to prevent under section 40 is payment from two different sources for the same injury, and not payment in excess of the worker's `actual damages.'" Frazier, supra, 142 N.J. at 603, 667 A.2d at 677. The compensation lien attaches to all sources of third-party recovery, including the functional equivalent of an actual tortfeasor, such as Horn Shechtman here. Id. at 601-02, 667 A.2d at 676; Utica Mutual, supra, 142 N.J. at 613, 667 A.2d at 681-82. The compensation carrier is accorded a "dollar-for-dollar" lien. Calalpa v. Dae Ryung Co., 357 N.J.Super. 220, 228, 814 A.2d 1130, 1136 (App.Div. 2003). "Hence, for every dollar of the employee's recovery from the third party, the carrier's lien under section 40 ... entitles it to reimbursement of one dollar (less legal cost) of workers' compensation benefits." Frazier, supra, 142 N.J. at 597-98, 667 A.2d at 674.
In a different context than presented in this case, our Supreme Court considered whether a compensation lien attached to uninsured motorist proceeds recovered from the claimant's own insurance company by a worker injured when struck by an unidentified hit-and-run driver. Midland Ins. Co. v. Colatrella, 102 N.J. 612, 510 A.2d 30 (1986). The Court noted that the predicate of the worker's uninsured motorist recovery was the same as the predicate for assertion of the compensation lien, namely the tortious conduct of the third-party. Id. at 617, 510 A.2d at 32. Thus, although N.J.S.A. 34:15-40 does not define "third person" to include an uninsured motorist or its carrier, the compensation lien would attach to the uninsured motorist insurance proceeds because of the Court's belief "that the primary concern of the Legislature here, as in other work-related injuries caused by third-party tortfeasors, is to integrate the sources of recovery." Id. at 618, 510 A.2d at 33 (emphasis added). This reinforces the proposition that the lien attaches to the entire third-party recovery as an integrated whole. The lien is not fragmented and does not attach in piecemeal portions to the various sources of an overall recovery. See Laureano, supra, 220 N.J.Super. at 299, 531 A.2d at 1363-64 (rejecting the argument that the amount of reimbursement of a compensation lien should be limited to 6% to reflect the portion of the judgment collected).
When the source of a third-party recovery is the Association, provisions of the Act may alter the full reimbursement requirement. The Act requires the Association to pay, on behalf of certain insolvent insurers and within specified limits, "covered claims." N.J.S.A. 17:30A-2a, -6, -8. The definition of "covered claim" contains an anti-subrogation provision: "`Covered claim' shall not include any amount due any ... insurer ... as subrogation recoveries or otherwise." N.J.S.A. 17:30A-5d. Based upon that language and the public policy underlying the Act, the claim of a compensation carrier to enforce *459 its lien is not a covered claim. Sussman v. Ostroff, 232 N.J.Super. 306, 313, 556 A.2d 1301, 1304-05 (App.Div.), certif. denied, 117 N.J. 143, 564 A.2d 865 (1989). We summarized the public policy this way: "Policyholders of solvent property and liability insurers pay only for the protection lost by similarly-covered policyholders of insolvent insurers, and the insurance industry itself bears the risk of loss of its own direct claims against the insolvent carrier, which they may, however, make against the insolvent carrier's receiver." Id. at 314, 556 A.2d at 1305.
In Sussman, we also articulated the public policy predicates underlying the workers' compensation scheme, which allows third-party tort actions but requires reimbursement to the compensation carrier from the proceeds: (1) the injured worker, while assured full recovery (deemed to consist of "any recovery obtained... by way of either judgment or settlement"), is nevertheless limited to one, non-duplicative recovery; and (2) as between the employer and the tortfeasor, the total compensatory burden is placed on the tortfeasor, at least where the common-law recovery exceeds the compensation benefits. Id. at 310, 556 A.2d at 1303. In essence, where there is third-party responsibility for the worker's injury, the compensation carrier serves as a temporary neutral conduit, providing immediate benefits to be later reimbursed. In the end, the third-party has paid and the injured party ends up with the same amounts they would have paid and received had there been no compensation lien. Thus, in the ordinary course, all third-party funds are subject to the compensation lien.
Where the only source of the third-party recovery is the Association, however, none of those funds are subject to the lien because the lien is not a covered claim. The compensation carrier, an "insurance industry creditor," is required to forgo its direct claim. This exception to the general rule is mandated by the anti-subrogation provision of the Act. The question presented in this case is whether, in a multi-defendant case, the compensation carrier may assert its entire lien against non-Association funds.
In our view, the anti-subrogation provision does not preclude full reimbursement. Generally, the compensation lien attaches to "any sum" recovered from one or more tortfeasors. Where part of the recovery emanates from a statutorily exempt source, the remaining portion of the recovery does not lose its character as "any funds" to which the lien attaches. Simply stated, NJM is not attempting to assert its $266,510.94 gross lien against the $50,000 Association contribution to plaintiff's settlement. It is asserting it against the $750,000 portion of the recovery that is not statutorily shielded.
NJM, the insurance industry creditor that possesses no covered claim against the Association, derives no benefit from the policyholders of solvent insurers whose surcharge payments fund the Association's operations. See N.J.S.A. 17:30A-8. None of the $50,000 paid by the Association goes to NJM. If, in a multi-defendant case with some non-Association and some Association funds, the non-Association funds were inadequate to satisfy the compensation lien, then, to the extent of the shortfall, the compensation carrier would suffer a loss. In that situation, the plaintiff's recovery from the Association's contribution would be reduced by the amount of the shortfall, i.e. the difference between the Association's contribution and the unreimbursed portion of the compensation lien. If the Association's contribution were equal to or less than the unreimbursed portion of the compensation lien, *460 the Association would be liable for defense costs of the tortfeasor insured by the insolvent insurer, but would be excused from making any payment to the plaintiff. Any loss suffered by the compensation carrier can be pursued against the insolvent insurer's receiver. See Sussman, supra, 232 N.J.Super. at 314-15, 556 A.2d at 1305-06.
This formulation comports with the statutory provisions of N.J.S.A. 34:15-40 and N.J.S.A. 17:30A-5d. It also comports with our holding in Sussman and is consistent with the policy considerations we there expressed. Plaintiff is fully compensated, but does not receive a double recovery that would result from a $16,656.93 credit. As between the compensation carrier and the tortfeasors, the tortfeasors ultimately bear the total compensatory burden. No portion of the Association's contribution inures to NJM's benefit. The same rationale that renders the compensation lien a dollar-for-dollar lien against an entire third-party recovery, whether or not plaintiff is fully compensated for the injuries suffered, supports our holding here. To the extent it has paid compensation benefits, the compensation carrier is subrogated to any non-exempt amount recovered from a tortfeasor. That money belongs to the compensation carrier, Sussman, supra, 232 N.J.Super. at 313, 556 A.2d at 1304-05, and it is entitled to receive it. We see no reason why the compensation carrier should not be entitled to recover the full $266,510.94 that belongs to it, dollar-for-dollar, out of the $750,000 non-exempt portion of the third-party settlement.
Indeed, if the injured worker does not diligently pursue a third-party recovery, the compensation carrier is authorized to institute an action against the tortfeasor to directly enforce its subrogation right. N.J.S.A. 34:15-40(f). The identity of the potential tortfeasors against whom a plaintiff chooses to pursue a third-party claim cannot serve to frustrate the compensation carrier's independent statutory remedy provided by subsection (f). The compensation carrier could, if plaintiff did not, pursue a third-party recovery against one or more tortfeasors not insured by insolvent insurers and satisfy its lien in full under this provision. Yet, if we accept the position advanced by the Association and plaintiff, if plaintiff pursues such tortfeasors and also another, who is insured by an insolvent insurer, the compensation carrier would suffer a loss. We do not believe the Legislature contemplated such an anomalous result. See Hartman v. Allstate Ins. Co., 345 N.J.Super. 101, 107-08, 783 A.2d 745, 749 (App.Div.2001) (Injured worker cannot frustrate compensation carrier's legitimate claim under N.J.S.A. 34:15-40(f) by abandoning his claim against his uninsured motorist carrier.).
The Law Division judge was of the view that a proper balancing of the policy considerations in the workers' compensation scheme and the Act requires an offset in a multi-defendant case to account for the Association's "privileged position" with respect to compensation liens. Primus, supra, 363 N.J.Super. at 543, 833 A.2d at 701. For the reasons we have stated, we do not agree. We are satisfied that when non-Association funds are available, all applicable policy considerations are vindicated by allowing first dollar reimbursement from those funds, but no reimbursement from Association funds.
In Sussman, we dealt with the interrelationship between the three parties involved, the compensation carrier, the Association, and the injured worker. Sussman, supra, 232 N.J.Super. at 314, 556 A.2d at 1305. In the case before us, a fourth party is involved, a group of solvent insurers. They possess no special status with respect to the compensation lien. The "privileged position" of the Association is not *461 general in nature. The Association pays claims by way of settlement or judgment, as the deemed insurer of the tortfeasor, in the same manner and to the same extent (within its statutory "policy" limits) as any insurer. It gets no discount. But when a compensation lien exists, the Association enjoys the benefit of the Act's anti-subrogation provision. This is the source and extent of the Association's preferred status in this regard.
In a multi-defendant case such as this, the benefit is triggered when non-Association funds are insufficient to fully satisfy the compensation lien. Then, the Association pays the plaintiff less than the amount it would otherwise be obligated to pay, or nothing at all. Our interpretation of the anti-subrogation provision allows full reimbursement of compensation liens from available non-Association funds while at the same time assuring that Association funds are not used for that purpose. Depending on the mix of Association and non-Association funds comprising a third-party settlement or judgment, the compensation carrier may or may not be fully reimbursed, even where the total settlement or judgment exceeds the compensation lien. Among these four parties, this arrangement fairly allocates the burden in a manner that is mandated by the provisions and policies of the Act and N.J.S.A. 34:15-40.
Plaintiff and the Association also rely on another provision of the Act, N.J.S.A. 17:30A-12b, the exhaustion and setoff provision:
Any person having a claim against an insurer, whether or not the insurer is a member insurer, under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his right under that other policy. An amount payable on a covered claim under P.L. 1974, c. 17 (C. 17:30A-1 et seq.) shall be reduced by the amount of recovery under any such insurance policy.
[N.J.S.A. 17:30A-12b.]
Relying on this section, the Association argues: "The workers' compensation benefits received by Mr. Primus constitute recoveries from another solvent insurer, and therefore, the Guaranty Association is entitled to deduct the amount of such recoveries (or some proportionate share) from any statutory benefits payable on the covered claims of Mr. Primus." We are not persuaded.
The first sentence of section 12b requires exhaustion of other available coverage before resort can be made to the Association. But the other available coverage referred to must be available to the insured to cover the same covered claim being defended by the Association. We have explained it thusly:
[T]he import of section 12b is, in our view, unmistakable. It provides, as relevantly redacted, that "any person having a claim against an insurer ... under any provision in an insurance policy other than a policy of an insolvent insurer ... shall be required to exhaust first his right under that other policy." The phrase "that other policy" which concludes the sentence obviously refers to the policy of the insurer who is not insolvent. Thus where the same covered claim is covered both by a solvent insurer's policy and an insolvent insurer's policy, the insolvent insurer's policy, irrespective of any "other insurance" clause in the policy, cannot be resorted to by the claimant until the policy limits under the solvent insurer's policy are exhausted. Therefore, until such exhaustion, the Association, as the "deemed" insurer under the insolvent insurer's policy, has no obligation. D'Achille's claim against Harrow was *462 covered both by Harrow's insolvent insurer, UCIC, and its solvent insurer, Hanover. Hanover's policy was required to be first exhausted. Its policy limits entirely covered the D'Achille claim. The Association has no obligation.
[Harrow Stores, Inc. v. Hanover Ins., 315 N.J.Super. 547, 555, 719 A.2d 196, 200 (App.Div.1998).]
Thus, if there were a solvent insurer other than Reliance that covered Horn Shechtman's professional liability risk, plaintiff would be obligated by the first sentence of section 12b to exhaust that policy before seeking coverage from the Association. Then, if the policy limits of that other insurance were not sufficient to cover plaintiff's claim, the second sentence of section 12b would render the Association an excess carrier by providing for a setoff against the Association's obligation by the amount recovered "under any such insurance policy." The quoted phrase at the end of the second sentence plainly refers to the policy of the solvent insurer described in the first sentence. If there exists no other insurance policy as described in the exhaustion provision, there is nothing to exhaust, and the setoff provision is not triggered. That is the situation here. Section 12b has no applicability whatsoever to the issue in this case and provides no authority for any reduction of NJM's lien.
The Law Division judge conducted a similar analysis and concluded that section 12b "simply does not deal with the question" of entitlement to an offset against the compensation lien in the circumstances of this case. Primus, supra, 363 N.J.Super. at 547-48, 833 A.2d at 703-04. Immediately after stating that conclusion, however, the judge continued, "In such a case [the Association] is entitled to the benefit of an available insurance policy such as a workers' compensation policy but only to the extent of its insured's relative liability." Id. at 548-49, 833 A.2d at 704. The judge seemingly accepted the Association's contention that NJM's compensation policy constitutes available coverage under section 12b, entitling the Association to an offset. We note also that the judge agreed with the approach advanced by Burke, id. at 551, 833 A.2d at 706, which relied on section 12b as the source of authority for a credit, id. at 550, 833 A.2d at 705-06 (¶ 9). Any reliance on section 12b to provide a credit against the compensation lien was inappropriate. That section has nothing to do with this case.
In justifying the credit, the judge also relied upon the underlying goals of tort law, assuring full and fair compensation to injured parties and deterring tortious misconduct. Id. at 549, 833 A.2d at 705. He also relied upon the goal of preserving the Association's funds. Id. at 551, 833 A.2d at 706-07. As we have discussed, assuring "full" recovery has never been part of the scheme of workers' compensation benefits and third-party recoveries subject to reimbursement to the compensation carrier. In any event, the procedures we prescribe, while prohibiting a double recovery, do not diminish plaintiff's recovery. It is the same as it would have been had there been no insolvent carrier or no compensation lien. Further, we fail to see how our holding will adversely impact deterrence of tortious misconduct.
Finally, we agree with the Law Division judge that it is in the public interest to preserve funds available to the Association, collected from thousands of policyholders via surcharges, for its operations, including satisfaction of covered claims. See, e.g., Carpenter Tech. Corp. v. Admiral Ins. Co., 172 N.J. 504, 515, 800 A.2d 54, 60-61 (2002) (The conservation of resources by the Association is a major *463 goal.); American Employers' Ins. Co. v. Elf Atochem North Amer., Inc., 157 N.J. 580, 590, 725 A.2d 1093, 1098-99 (1999) (A concern of the Legislature is to conserve Association resources to assure their availability to serve its core purposes.). The Legislature has provided various means to accomplish this purpose, e.g., limitation of coverage to $300,000 subject to any deductible in the affected policy, N.J.S.A. 17:30A-8a(1); the anti-subrogation provision, N.J.S.A. 17:30A-5d; the exhaustion and setoff provision, N.J.S.A. 17:30A-12b.
While legislative intent is an appropriate consideration in interpreting a statute, Cornblatt v. Barow, 153 N.J. 218, 231, 708 A.2d 401, 407 (1998), a statute clear on its face must be enforced according to its terms. Hubbard ex rel. Hubbard v. Reed, 168 N.J. 387, 392, 774 A.2d 495, 498 (2001). It is true that the position advanced by plaintiff and the Association might save the Association money in some circumstances. But in this statutory complex we are directed to no statutory provision that is capable of differing interpretations, one of which is that proposed by plaintiff and the Association, for which we might consider the laudable goal of preserving Association funds as an aid to construction. The Legislature has made provisions to implement the preservation goal. The result sought here by plaintiff and the Association is not among them.
Reversed and remanded for entry of an order consistent with this opinion.
NOTES
[1] This sum represents 1/16 of the gross lien. In light of our disposition that there is no offset, we do not address NJM's alternative argument that if there is an offset it should be calculated based on the net lien. See N.J.S.A. 34:15-40(e).
[2] For the sake of completeness, we make these observations, none of which affect the outcome of the appeal:

In support of plaintiff's motion, plaintiff's counsel certified that he was advised by the Association's counsel "that the plaintiffs would receive a credit [attributable to the Association's $50,000 contribution] since the workers compensation lien could not attach to any funds paid by [the Association]." He concluded that "[t]he plaintiff should receive the benefit of that credit." (Emphasis added). On appeal, plaintiff insists that he should be paid $50,000 by the Association and receive a credit against the workers' compensation lien of $16,656.93. At oral argument, plaintiff's counsel stated his understanding that the $50,000 was negotiated as a net payment from the Association. In other words, the Association was contributing some unspecified amount greater than $50,000, and the $50,000 payment represented an approximated discounted amount after deducting the offset against the compensation lien.
Plaintiff's motion was also supported by a certification of the Association's counsel, John Burke, who stated that he made it clear to all parties during the settlement negotiations that any contribution made by the Association "would reflect not only a consideration of the potential liability or non-liability of Ace Scaffolding, and the potential liability or nonliability of Horn Shechtman, but also the fact that the workers' compensation lien would be reduced to the extent of [the Association's] involvement in the case." At oral argument, the Association's counsel stated that the Association does not intend to pay plaintiff $50,000, which was a gross settlement figure before offset, but only $33,343.07. Although not supported by the motion record or the judge's order, the Association claims this was always the understanding.